UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARTIN LERMA-MAYORAL,<br><br>                                  Plaintiff,<br><br>v.<br><br>CITY OF EL CENTRO, et al.,<br><br>                                  Defendant. | Case No.:  15cv818-LAB (PCL)<br><br>**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**ORDER OF REMAND**<br><br>**[DOCKET NUMBERS 65, 66, 73.]** |

This action was removed from the Superior Court of the State of California for the County of Imperial based on federal question jurisdiction.   After the complaint was amended three times and the parties had an opportunity for discovery, three Defendants remained: the City of El Centro, the County of Imperial,[1] and Rafael Peraza, an investigator with the Imperial County District

_____

[1] The Imperial County Sheriff's Department is also nominally a Defendant, but no separate allegations are made against the Department that are not also made against the County, and the Complaint does not appear to treat it as an entity separate from the County. (*See* Third Am. Compl.*,* ¶ 6 (alleging the Department is owned, operated, and controlled by the County, and is an operating Department of the County).) The notice of removal represents that the County was erroneously

Attorney's office. Peraza was part of the Imperial County Narcotics Task Force ("ICNTF"), which the City of El Centro and the County of Imperial were also involved in. Although Lerma-Mayoral knew about other officers who were involved in this incident, he did not pursue claims against them.

Defendants have now filed motions for summary judgment. (Docket nos. 65 ("El Centro Motion") and 66 ("Imperial/Peraza Motion").) Imperial County and Peraza have objected to some of the evidence Lerma-Mayoral relied on in his opposition.[2] (Docket no. 75.) Imperial County and Peraza also filed an *ex parte* motion for leave to exceed the page limit for their reply brief, which Lerma-Mayoral did not oppose. This *ex parte* motion (Docket no. 73) is **GRANTED** and the reply brief is accepted as filed.

**Factual Background**

The following summary is based either on Plaintiff Martin Lerma-Mayoral's version of the facts, or on undisputed facts.

On the evening of January 29, 2014, two El Centro Police Department officers responded to a call regarding a possible domestic battery. When they arrived, they saw a man, whom they recognized as Marc Anthony Ayala, leaving the scene on a bicycle. Ayala was a known gang member with a criminal history, who was wanted both on a parole violation and also in connection with a local arrest warrant. As they followed him in their patrol car, Ayala pulled a handgun out of his waistband and raised it in the air. After this, they lost sight of him and he got away.

/ / /

---

sued under this name. (*See* Docket no. 1 at 1.) Although no party has requested dismissal, the Court will therefore treat claims against the Department as a separate entity as abandoned.

[2] The Court has not relied on this evidence, and therefore need not rule on the objections.

The ICNTF is a joint task force made up of federal and local law enforcement officers. The ICNTF was under the command of Michael Loyd, a private security contractor. On January 30, the ICNTF decided to conduct an operation to locate and arrest Ayala based on his two outstanding warrants[3] and because he had brandished a handgun at the officers the day before.

One officer from the El Centro Police Department, Steven Fisher, was assigned to the ICNTF and was involved in the planned operation. Fisher learned that Ayala was staying at the Premier Hotel in El Centro. Fisher was also told by an informant that Ayala was armed and willing to "shoot it out" with police, if necessary to avoid going back to prison. Fisher briefed the operations team on Ayala and the plan to capture him. Peraza was a member of the team.

The team knew Ayala did not have access to a vehicle. While they thought he might be picked up by another gang member, their plans did not include the possibility that he would get into a taxi or a car driven by an innocent third party.

Plaintiff Lerma-Mayoral was a taxi driver who was dispatched to the Premier Hotel to pick up Ayala. Officers who were watching the Premier Inn saw Ayala preparing to get into the taxi and decided they were not able to prevent him. The officers developed a plan to have a marked unit do a traffic stop and get Ayala out of the vehicle. After picking Ayala up, Lerma-Mayoral drove to an apartment complex about half a mile away, then stopped to let Ayala get out. Several ICNTF

///

---

[3] Lerma-Mayoral's opposition claims the officers did not observe Ayala doing anything illegal, and did not have a warrant for his arrest. (Opp'n to Imperial/Peraza Motion, 7:27–28 (citing Loyd Depo. at 119:15–19).) But the evidence it cites only says the officers did not see Ayala doing anything illegal; it says nothing about the absence of a warrant. Apparently what the opposition meant to refer to was Loyd's statement that the team did not have a warrant authorizing them to make a no-knock entry into Ayala's motel room, and wanted to wait until he left it before arresting him. (Loyd Depo. at 52:6–20.)

vehicles surrounded the unit, blocking his exit. What happened next is disputed, and is the basis for Lerma-Mayoral's claims.

Several officers stood close to the taxi, pointing their weapons toward it and shouting commands at Ayala. Lerma-Mayoral shouted to the officers to be let out of the taxi, and tried to get out. One of the officers, he says, held the door shut, preventing him from getting out. Several unidentified officers pointed their weapons towards him while aiming at Ayala. He leaned forward, hugging the steering wheel. And, according to Lerma-Mayoral, Ayala then put both of his hands in the air.

ICNTF officers then fired into the taxi, killing Ayala.[4] Lerma-Mayoral estimates that at least fifty bullets were fired, and thirty-seven were later found in Ayala's body. No bullets hit Lerma-Mayoral, but he was hit and injured by glass fragments. Officers, seeing Lerma-Mayoral was injured, pulled him out of the taxi, then left him on the ground outside the taxi for several minutes. They then called paramedics, who took Lerma-Mayoral to the hospital.

**Legal Standards**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to show there is a genuine factual issue for trial. *Id.* at 324. The non-moving party must produce admissible evidence, and cannot rely on mere allegations. *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008). This can be done by presenting evidence that would be admissible at

---

[4] Ayala's heirs and successors in interest sued separately, in 15cv397-LAB (PCL), *Ayala v. County of Imperial* (filed Feb. 23, 2015).

trial, *see Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002), or by pointing to facts or evidence that could be presented in admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). But evidence that is not admissible and could not be presented at trial in admissible form is not enough to resist summary judgment. *See Orr*, 285 F.3d at 773.

The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Not all factual disputes will serve to forestall summary judgment; they must be both material and genuine. *Id.* at 247–49. Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Id.*, 477 U.S. at 248.

Although the briefing does not argue the point, Lerma-Mayoral has standing to raise his own constitutional rights, not those of Ayala (whose rights could be, and were raised in a separate suit). *See Alderman v. United States*, 394 U.S. 165, 174 (1969) (holding that Fourth Amendment rights cannot be vicariously asserted); *United States v. Mitchell*, 915 F.2d 521, 526 n.8 (9th Cir. 1990) (due process rights are personal and cannot be asserted vicariously). The Court is obligated to raise jurisdictional issues such as standing, *sua sponte* if necessary. *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). Here, that means the Court will treat Lerma-Mayoral's arguments about these rights as arguments about his own rights, not Ayala's.

**Claims**

Lerma-Mayoral brought nine claims in all, three of which arose under federal law. He brought his Fourth claim, under 42 U.S.C. § 1983, against all Defendants. The Fifth claim, against the City of El Centro and Imperial County, is brought under

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Sixth claim, for failure to train, alleges that the City's and County's failure to train their officers amounted to a violation of Lerma-Mayoral's constitutional rights under the First, Fourth, and Fourteenth Amendments. The "failure to train" claim is pled as a § 1983 claim. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (treating "failure to train" claim alleging constitutional violations as a type of § 1983 claim).[5]

The remaining claims all arise under California law, and Lerma-Mayoral argues the Court should exercise supplemental jurisdiction over them. These include claims for negligence (First claim); assault (Second claim); violation of California civil rights, *i.e.*, Bane Act claim (Third claim); intentional infliction of emotional distress (Seventh claim); negligent conduct of a public employee (Eighth claim); and false imprisonment (Ninth claim). Even though the Bane Act claim is premised in part on a violation of federal rights, it does not arise under federal law. *See Int'l Union of Operating Engineers v. City of Plumas*, 559 F.3d 1041, 1045 (9th Cir. 2009). The parties are not diverse, so there is no source of jurisdiction over these claims other than supplemental jurisdiction.

**Federal Claims**

In his Opposition to the El Centro Motion (Docket no. 71), Lerma-Mayoral abandoned most claims against the City, including all federal claims. The only claims he opposed summary judgment on were his negligence claim and his intentional infliction of emotional distress claim. He expressly withdrew his § 1983

/ / /

/ / /

---

[5] The County's Motion expresses some uncertainty whether the failure to train claim arises under § 1983 or state law. But in either case it points out there is no evidence of failure to train. Because Lerma-Mayoral's opposition did not argue it or point to any evidence supporting this claim, it is subject to dismissal in any event.

claims,[6] as well as his claims for assault, false imprisonment, and Bane Act claims against the City. (Docket no. 71 at 14:3–4.)

Lerma-Mayoral also withdrew his "claim for municipal liability" against Imperial County. (Docket no. 70 at 17:1–2.)  This includes his *Monell* claim (the Fifth claim), but not his Bane Act claim, which he argued in his opposition. It is less clear whether he intended to formally withdraw his Sixth claim, for failure to train. But because the Imperial/Peraza Motion sought summary judgment on this claim, and Lerma-Mayoral's opposition did not oppose that argument, if the Sixth claim were not withdrawn, Lerma-Mayoral's failure to oppose summary judgment on this claim would amount to abandonment.  *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff abandoned claims by not raising them in opposition to the defendant's motion for summary judgment).

The only claims Lerma-Mayoral opposed the Imperial/Peraza's motion to dismiss were his Fourth and Fourteenth Amendment based § 1983 claim against Peraza, as well as his state claims against the County. In connection with the § 1983 claim, the Opposition mentions the actions of other officers. But it does not link them to any policy or practice so as to give rise to a *Monell* claim, nor does it even discuss a failure to train claim, or any other theory that would make the County liable.  There is no respondeat superior liability under § 1983. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018).

The only federal claim left in the case is therefore the Fourth (§ 1983) claim, against Peraza, for Fourth Amendment and Fourteenth Amendment violations.  All other federal claims  have been  either explicitly withdrawn  or else  abandoned by

/ / /

---

[6] These included his Fifth (*Monell*) and Sixth (failure to train) claims. *See generally Monell*, 436 U.S. 658 (treating claim as arising under § 1983); *City of Canton*, 489 U.S. at 388 (1989) (treating "failure to train" claim as a type of § 1983 claim).

15cv818-LAB (PCL)

failure to oppose summary judgment on them. *See Shakur*, 514 F.3d at 892. Peraza argues he is entitled to qualified immunity, a defense he pled in his answer.

**Claim Against Peraza and Qualified Immunity**

Because this claim is the only jurisdictional "hook," the Court addresses it first. The Third Amended Complaint ("TAC") alleges that Peraza was part of the group of officers who surrounded the taxi. Lerma-Mayoral's claims against Peraza are based on allegations that Peraza prevented Lerma-Mayoral from getting out of the taxi, pointed his firearm at Lerma-Mayoral, then shot at him and into the taxi. (TAC, ¶¶ 5, 15, 17, 43, 48, 82.) Although the TAC claimed Peraza held the taxi door closed, preventing Lerma-Mayoral from getting out, the undisputed evidence shows this was not Peraza, and Lerma-Mayoral has abandoned this theory of liability against him.

**Qualified Immunity Standard**

Qualified immunity protects government officials from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Deciding whether an officer is entitled to qualified immunity is a two-step inquiry. First, the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right. Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* at 232. District judges may use their discretion to decide which prong to address first. *Id.* at 236.

The officer's own conduct is judged in light of his circumstances, including what he knew at the time. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This means, among other things, that he cannot be held liable for his good faith belief in what other officers told him, even if it turns out to be wrong. *See United States v. Hensley*, 469 U.S. 221, 232 (1985). *See also Ramirez v. Butte-Silver Bow County*, 298 F.3d

1022, 1027–28 (9th Cir. 2002) (line officers acted reasonably by accepting their superiors' representations that they had a valid warrant; even if the superiors might be liable, the line officers were not). Qualified immunity protects officers who are reasonably mistaken about the facts or the law, or both. *Pearson*, 555 U.S. at 231.

Qualified immunity does not apply to tort or civil rights claims under California law. *Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009).

**Evidence**

Peraza cites undisputed evidence showing that he was briefed in advance about the planned operation. (*See* Imperial/Peraza Motion at 2:15–24 (citing evidence).) On the evening of January 30, he arrived at the scene after the taxi was already stopped. (*See id.* at 3:25–4:14.) The taxi was already surrounded by three other vehicles, and other officers were standing around it, pointing their weapons. (*Id.* at 4:7–14.) As he approached, another officer yelled that Ayala had a gun. (*Id.* at 4:15–16.) Peraza took cover behind a dumpster about five to six feet away from the taxi, on the driver's side. (*Id.* at 4:16–17.) Then someone yelled that Ayala had a hostage. (*Id.* at 4:18–19.) Lerma-Mayoral does not dispute any of this. (*See* Opp'n to Imperial/Peraza Motion at 6:2–6.)

What happened after the taxi was stopped is the subject of some dispute. Peraza said he drew his pistol and aimed it toward Ayala. (Imperial/Peraza Motion at 4:19–20.) He says he saw the silhouette of Ayala's arm, holding a gun pointed towards the driver, and ordered Ayala to drop the gun. (*Id.* at 4:20–22.) He agrees with Lerma-Mayoral that the windows were tinted, so he did not see a gun, only the silhouette of what looked like one. (*Id.*) Then he heard a shot, and believing that Ayala had either shot the driver or shot at police, began firing at Ayala. (*Id.* at 4:22–25.) Lerma-Mayoral agrees Peraza began shooting at Ayala because he heard this shot. (Opp'n to Imperial/Peraza Motion, 7:10–11.)

Peraza says he never held the driver's door closed, never removed him from the taxi, and never had any other interaction with him after the shooting.

(Imperial/Peraza Motion at 4:26–5:1.)  Although Lerma-Mayoral initially accused Peraza of holding the door shut, he now concedes a different officer, Agent Mange, held the door shut. (Opp'n to Imperial/Peraza Motion at 6:20–25, 10:8–9.)  He also appears to concede that one or more other officers, not Peraza, pulled him from the taxi. (Opp'n to Imperial/Peraza Motion 7:17–24.)

Whether Ayala was holding a gun is sharply disputed.  As Lerma-Mayoral points out, the windows of the taxi were tinted, so Peraza could not have had a clear view of whether Ayala was holding a gun. (Opp'n to Imperial/Peraza Motion, 7:7–8.)  Another agent, Mague, was positioned between five and ten feet from the taxi's rear door, and did not see Ayala holding a gun. (Opp'n to Imperial/Peraza Motion, at 5:24–6:1, 7:11–12.)  Lerma-Mayoral, too, testified he did not see Ayala holding a gun or doing anything threatening. (*Id.* at 12:5–8.) After the shooting, Peraza opened the door and saw Ayala slumped over; he did not remember seeing a gun in Ayala's hands.  (*Id.* 7:17–19.)  After the shooting, however, two other officers said they saw a handgun in Ayala's hand.  (Imperial/Peraza Motion at 5:1–2.)  Between the time the taxi came to a stop and the time the shooting began, about ten to fourteen seconds passed.  (Opp'n to Imperial/Peraza Motion, Ex. A (Plaintiff's Depo. Tr.) at 81.)

Although the TAC alleges that Peraza both pointed his gun at and shot at Lerma-Mayoral, there is no evidence of this.  The evidence Lerma-Mayoral cites only shows Peraza was pointing his gun at the taxi, and shot at Ayala.  (Opp'n to Imperial/Peraza Motion, 13:22–25, 14:12–13.)  Although Lerma-Mayoral testified that four officers pointed their weapons at him (*id.* at 10:5–7, 25:8–11), his testimony makes clear they did this in the course of aiming at Ayala.

Lerma-Mayoral testified that he knew where guns were aimed by red lights that shone into the taxi, which were used for aiming.  (Plaintiff's Depo. Tr. at 68.)  There was no evidence regarding whether Peraza's firearm had a red light. Lerma-Mayoral testified Agent Mange pointed a gun at him while attempting to aim at

Ayala. (*Id.* at 73.) He also testified that two other officers, whom he did not identify but which might have included Peraza, pointed guns at him while taking aim at Ayala. (*Id.* at 74.) When the red lights appeared on the left side of his head and his left shoulder, he leaned forward against the steering wheel to get out of the way. (*Id.* at 73.) Immediately after he got out of the way, the officers began shooting. He did not testify that officers shot at him or attempted to shoot him, only that they aimed at and shot Ayala, who was in the back seat. (*See also* Opp'n to Imperial/Peraza Motion, Ex. D (Peraza Depo. Tr.) at 108:14–23 (testimony of Peraza that he aimed and shot at Ayala).)

## Peraza's Liability for Other Officers' Actions

A significant part of Lerma-Mayoral's argument focuses on the actions of other officers, as if they are attributable to Peraza. He explains that the purpose of this is to show that he is not, as Peraza would have it, trying to establish "bystander liability." (Opp'n to Imperial/Peraza Motion, at 8:28–9:1, 14:4–14.) Instead, he attempts to show that as a "full active participant" in the operation, performing "police functions integral" to it, Peraza is liable for excessive force used in effecting a seizure of Lerma-Mayoral. (*Id.* at 14:8–14.) In support of the theory that an officer who is an "integral participant" can be held liable, he cites *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) and *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both *Melear* and *James* were quite different cases, however. In those cases, the officers knew in advance a particular unconstitutional search tactic was being used or would be used, did not object, and provided armed backup support during the search. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (summarizing the salient facts of *James* and *Melear*). The Ninth Circuit agrees that active participants who play an integral role in unconstitutional conduct can be held liable even if their individual actions did not rise to the level of a constitutional

/ / /

15cv818-LAB (PCL)

violation. *Id.* But it has warned against an expansive reading of these decisions. *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996).

There is no "team effort" liability for constitutional violations under § 1983. *Id.*, 76 F.3d at 294–95. The fact that an officer is part of a group that commits a constitutional violation does not make that officer liable under this theory. Rather, the officer is judged by his own conduct. *Id.* He can be liable only on the basis of "integral participation in the violation." *Id.* at 294 (quoting *Melear,* 862 F.2d at 1186). Even being armed and present does not render an officer an active participant. *See Jones v. Williams*, 297 F.3d 930, 938–939 (9th Cir. 2002) (rejecting suggestion that remaining armed during a search meant that officers were participants in the search). This principle also applies to Fourth Amendment violations, *see Chuman*, 76 F.3d at 294–95, as well as to Fourteenth Amendment due process violations. *Chudacoff v. Univ. Med. Center of S. Nev.*, 649 F.3d 1143, 1151 (9th Cir. 2011) (citing *Boyd*, 374 F.3d at 780).

**Qualified Immunity Analysis of Fourth Amendment Claim**

Excessive force must be measured by the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 394–95. Defendants' use of force must be "'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. This inquiry is highly fact specific. *Scott v. Harris*, 550 U.S. 372, 383 (2007). The inquiry is an objective one; the question is whether an officer's actions are "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham* at 397.

Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

15cv818-LAB (PCL)

particular situation." *Id.* at 397. *See also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (warning judges to "be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation"). The reasonableness of the force used to effect a particular seizure is determined by carefully balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham* at 396.

Lerma-Mayoral points out that, by pulling over and surrounding the taxi, pointing their guns, and shooting, the officers effected a seizure, not only of the passenger, but also of the driver. *See Brendlin v. California*, 551 U.S. 249, 254– 56 (2007). Peraza has cited a number of decisions suggesting that incidental restraint of hostages or bystanders should be analyzed under the Fourteenth rather than the Fourth Amendment. But after *Brendlin* it is questionable whether these are still good law. Several Circuits, but not the Ninth, have held that when officers attempt to seize one person in a vehicle, they are not effecting a seizure (within the meaning of the Fourth Amendment) of other occupants of the vehicle for § 1983 purposes. *See Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (citing and discussing cases), *cert. denied sub nom. Davenport v. Borough of Homestead, Pa.*, 138 S. Ct. 1263 (2018). It is not clear whether *Brendlin* has effectively overruled these. *Id. See also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (declining to express a view on this question). But in any event, decisions since *Brendlin* have examined officers' behavior under the Fourth Amendment. *Davenport*, 870 F.3d at 279. Although other courts have taken a different approach, *see, e.g., Nakagawa v. Cnty. of Maui*, 2014 WL 1213558 at *5– *6 (D. Haw. Mar. 21, 2014), the Court agrees with the Third Circuit's analysis. Furthermore, to the extent Lerma-Mayoral's claims are premised on an excessive force theory, this is consistent with *Graham*'s holding that all claims of excessive force in the course of an investigatory stop should be analyzed under the Fourth

15cv818-LAB (PCL)

Amendment's "reasonableness" standard rather than the Fourteenth Amendment. 490 U.S. at 394–95.

Under this reasoning, Lerma-Mayoral was seized within the meaning of the Fourth Amendment when other officers intentionally stopped the taxi and prevented him from getting out.[7]

But this does not by itself mean Peraza or the other officers were violating Lerma-Mayoral's Fourth Amendment rights. The Fourth Amendment is only violated by unreasonable seizures. *See Graham*, 490 U.S. at 395–96 (noting Fourth Amendment's "reasonableness" standard). While the "reasonableness" inquiry is fact-based and heavily dependent on the circumstances of each case, *id.* at 396, it does not follow that qualified immunity or summary judgment are never appropriate.

When considering whether summary judgment is appropriate on qualified immunity grounds or on some other basis, the Court is required to consider Peraza's actions individually, bearing in mind what he knew, what he had the power to do, and what he did. In that light, there is no evidence Peraza was acting unreasonably by pointing his gun at Ayala. While it is apparent Peraza knew he was also incidentally seizing Lerma-Mayoral, there is no evidence he was unreasonable in doing that either. In the situation confronting him, he could not have seized Ayala without also seizing Lerma-Mayoral. Furthermore, he objectively had reason to believe Lerma-Mayoral was, or at least might be Ayala's

---

[7] This also avoids the thornier problem of whether Lerma-Mayoral should be treated as a hostage for purposes of this analysis. *See, e.g., Dietzmann v. City of Homer*, 2010 WL 4684043, at *13 (D. Alaska, Nov. 17, 2010) (distinguishing "hostage" cases on the basis that children who were in seized van were not hostages). Although this affects the Court's analysis, it does not affect the outcome. As discussed below, treating Lerma-Mayoral's claims as arising under the Fourteenth Amendment would lead to the same result.

15cv818-LAB (PCL)

hostage, and therefore not free to leave in any event. The fact that it turned out Lerma-Mayoral was not really a hostage does not change the analysis. *See Kingsley*, 135 S. Ct. at 2473; *Graham*, 490 U.S. at 396.

Other officers' actions are not attributable to Peraza if he had no role in them. Here, it is undisputed that Peraza was under the command of other officers who had planned the operation. When Ayala unexpectedly got into a taxi, those officers decided to carry out a traffic stop. Peraza had no part in deciding to allow Ayala to get into the taxi, and he did not help formulate the plan for the traffic stop. Rather, he heard about it on the radio when he was a short distance away from the motel. Although he followed the taxi, he had no role in stopping it. When he arrived at the apartment complex, the stop of the taxi and the seizure of Lerma-Mayoral was already underway. Peraza was therefore not an active participant in the initial stop and seizure of Lerma-Mayoral. Peraza also did not hold Lerma-Mayoral's door shut, and there is no evidence he did anything to help or encourage Agent Mange to do that.

As a matter of law, stopping the taxi was reasonable, given what officers knew. Ayala was a wanted criminal, and reportedly armed, dangerous, and bent on escape at any cost. Furthermore, he had successfully evaded officers the previous day. Lerma-Mayoral suggests officers should have allowed Ayala to exit the taxi before trying to apprehend him. But doing this would have carried with it many other serious risks both to the officers and the public. The stop itself, therefore, was reasonable.

Peraza arrived after the stop was already in progress, the taxi's exit was blocked, and other officers were already surrounding the taxi, pointing their weapons. He had a poor view of Ayala through the tinted windows, but was warned by another officer that Ayala had a gun. He was also told by another officer that Ayala had a hostage, *i.e.*, Lerma-Mayoral. Peraza pointed his gun at Ayala. In doing so, he may have pointed it at Lerma-Mayoral as well, and for purposes of

15cv818-LAB (PCL)

this motion the Court will assume he did. That said, his purpose and that of the other agents was obviously to aim at Ayala. There is no evidence they viewed Lerma-Mayoral as anything but a hostage or some other innocent bystander. In this situation, incidentally and briefly pointing a gun in Lerma-Mayoral's direction was hardly a use of force at all, and certainly not excessive. *See Mehta v. City of Upland*, ___ Fed. App'x. ___, 2018 WL 4178134, slip op. at *2 (9th Cir. Aug. 31, 2018) (temporarily aiming a gun at a non-suspect in order to get him out of a car where he was in danger was not unreasonable). Peraza also participated in the shooting of Ayala. During the hail of bullets, Lerma-Mayoral was effectively pinned down, and could not have escaped the car without endangering himself. Lerma-Mayoral also argues that Peraza is responsible for incidental injuries to Ayala.

The only Fourth Amendment violations Peraza could arguably have committed occurred between the time he arrived at the traffic stop and the time Lerma-Mayoral was taken to the hospital. Specifically, Lerma-Mayoral's claim would have to be that Peraza escalated an otherwise reasonable seizure by pointing his gun into the taxi and shooting at Ayala.

Importantly, this time period was very short, and events unfolded quickly. Lerma-Mayoral said he thought the entire episode, from the time the taxi stopped until the shooting started, lasted no more than about fourteen seconds. And because Peraza arrived after it had begun, Peraza's involvement must have been even shorter.

It is undisputed that other officers warned Peraza that Ayala had a gun and was holding Lerma-Mayoral hostage. As part of the operations team, Peraza also had been warned that Ayala was armed and had brandished a handgun at officers just one day earlier. He had also been told that Ayala was willing to "shoot it out" with officers to avoid going back to prison. As Peraza arrived at the scene and began walking towards the taxi, another officer yelled that Ayala had a gun, and Peraza took cover behind a dumpster. Then someone yelled that Ayala had a

15cv818-LAB (PCL)

hostage, apparently referring to the driver.  Bearing in mind all Peraza had been told about Ayala, he could reasonably rely on these two warnings by fellow officers, even if he had no clear view of Ayala.  Even assuming the other officers were acting unreasonably, as Lerma-Mayoral's opposition argues, Peraza had no reason to question their warnings, nor could he have conducted his own investigation even if he suspected they were wrong.

Because it is disputed whether Ayala was holding a gun, or even had a gun, the Court will assume he was unarmed and was holding his empty hands in the air, as Lerma-Mayoral testified. The parties agree, however, that the taxi windows were tinted, and that Peraza had a poor view of Ayala.  Peraza said he only saw Ayala in silhouette. No evidence suggests Peraza had a good view of Ayala, so as to make Peraza's reliance on the other officers' warnings unreasonable.

When a shot was fired, Peraza had no reasonable opportunity to find out who fired it or why. But he had reason to conclude, as he did, that Ayala was either shooting his hostage or shooting at officers. Even assuming he was mistaken, his mistake was a reasonable one. Furthermore, the exigent circumstances forced him to act quickly and without delay. There appears to have been no alternative, and Lerma-Mayoral suggests none, than to return fire. Retreating, or doing nothing at all would have exposed Lerma-Mayoral, the officers, and the public to the danger of being injured or killed. His decision to return fire was the kind of split-second judgment in a rapidly-unfolding situation that the Supreme Court has said lower courts must make allowances for.  *See Graham*, 490 U.S. at 397.

The fact that Lerma-Mayoral was in the same vehicle and was injured does not make the decision to shoot unreasonable. The parties agree that officers were quite close to the car, and avoided shooting until Ayala was out of the line of fire. Of the estimated fifty bullets fired, most hit Ayala, and the remainder apparently hit the taxi. Peraza was also permitted to consider, in this quickly-unfolding situation,

/ / /

the risk to Lerma-Mayoral against what he believed was the likelihood Ayala was shooting to kill.

Although Lerma-Mayoral was not shot, he was injured by broken glass. He was also effectively trapped in the taxi and forced to undergo a terrifying ordeal. But there is no evidence Peraza or any other officer ever intended or tried to shoot him, or that he was their target. The undisputed evidence makes clear the officers intended to direct their force at Ayala, and in doing so they necessarily involved Lerma-Mayoral. To the extent Lerma-Mayoral was "seized" by being forced to remain in the taxi during the shooting, his claim is covered by most of the same analysis as is his claim based on Peraza's forcing him to remain in the taxi by pointing a gun at Ayala.

A different question is whether, and to what extent, Lerma-Mayoral's injuries amounted to an unreasonable seizure. Peraza cites a number of cases where hostages or bystanders are accidentally injured. *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) is the starting point for most of these. Among other things, it stands for the proposition that unintentionally-applied force does not violate the Fourth Amendment. *Id.* Because Lerma-Mayoral was injured by broken glass that shattered when officers shot at Ayala, and not by any force the officers intentionally directed at him, his injuries do not amount to a Fourth Amendment violation. *See Arruda ex rel. Arruda v. Cnty. of Los Angeles*, 373 Fed. Appx. 798, 799 (9th Cir. 2010) (citing *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990)) ("[A] shooting victim struck by an officer's stray bullet is not seized because the victim was not the 'object' the officer intended to strike.") To the extent Lerma-Mayoral suffered any injuries as a result of fear of the bullets, the noise, etc. the same reasoning applies.

Lerma-Mayoral maintains that several minutes after the shooting ended, some officers opened his door and dragged him behind a garbage can where they threw him to the ground. Peraza argues he was not one of them, and points out

there is no evidence he was one of them. Lerma-Mayoral has not opposed this. (Opp'n to Imperial/Peraza Motion, at 7:22–24 (citing evidence that "officers" pulled him from the taxi and threw him to the ground.) Even assuming this amounted to excessive force, the claim that Peraza participated and is responsible has been abandoned.

**Fourteenth Amendment Claim**

A traffic stop amounts to a seizure of both driver and passengers, within the meaning of both the Fourth and Fourteenth Amendments. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Although the Court has found Lerma-Mayoral's claims against Peraza under the Fourth Amendment must fail, they also fail if analyzed under the Fourteenth Amendment.

Lerma-Mayoral asks the Court to apply a "deliberate indifference" theory of Fourteenth Amendment due process liability. Under the "deliberate indifference" theory, excessive force by officers can give rise to a Fourteenth Amendment violation only if it would have been practical for Peraza to actually deliberate. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). If, on the other hand, the officer "makes a snap judgment because of an escalating situation," the Fourteenth Amendment is violated only if the officer "acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (citing *Porter v. Osborn,* 546 F.3d 1131, 1140 (9th Cir. 2008).)

Lerma-Mayoral has disavowed a "purpose to harm" theory, and focuses instead on the "deliberate indifference" theory. But the evidence cannot support a finding that it was practical for Peraza to deliberate. He arrived after the traffic stop was underway, a few seconds before the shooting began. The initial stop was not his doing. And his decision to take a position near the taxi, and then to point and shoot his firearm into it is the epitome of a snap judgment made in the course of an escalating situation. In short, it is clear Lerma-Mayoral cannot raise a Fourteenth Amendment claim.

15cv818-LAB (PCL)

## Disposition of § 1983 Claim Against Peraza

Although this order discusses Peraza's actions individually, it has considered them in the aggregate as well. On the basis of undisputed facts, it is clear that Peraza's alleged actions did not violate Lerma-Mayoral's Fourth or Fourteenth Amendment rights. The qualified immunity analysis does not require the Court to go further. But even assuming Lerma-Mayoral could establish that Peraza violated his Fourth or Fourteenth Amendment rights, Peraza would still not be liable if his mistakes were reasonable. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). Here, any mistakes Peraza made were reasonable, and not the result of plain incompetence or knowing violation of the law.

The Court holds that Lerma-Mayoral has not established any Fourth or Fourteenth Amendment claim against Peraza. But even if he had, any mistakes Peraza made were reasonable under the circumstances, and he would be entitled to qualified immunity.

## Tort Claims

### Peraza

For reasons discussed above, Peraza is not liable for any claims arising from holding the taxi door closed or dragging Lerma-Mayoral from it. This includes the false imprisonment claim, as well as parts of other claims arising from these events.

A claim for intentional infliction of emotional distress requires, among other things, "extreme and outrageous conduct" by the Defendant, accompanied by either the intention to cause or the reckless disregard of the probability of causing emotional distress. *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009). "Outrageous" conduct is conduct that is so extreme that it "exceed[s] all bounds of that usually

tolerated in a civilized community." *Id.* (citations and quotations omitted). There is no evidence from which a reasonable jury could conclude this element was satisfied, and Peraza is therefore entitled to summary judgment on this claim.

Lerma-Mayoral's challenge to Peraza's decision to begin shooting was part of the analysis of his § 1983 claim, but he lacked standing to assert Ayala's Fourth or Fourteenth Amendment rights under § 1983. But he points out that under California law, transferred intent means he may be able to rely on this in establishing his claim of assault. *See Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 952–53 (E.D. Cal., 2011). In bringing this claim, he may be able to rely on some factors he could not raise in his § 1983 claim. Furthermore, this claim is not subject to the qualified immunity defense.

Negligence is a more difficult question. The same standard applies to § 1983 excessive force claims as to California negligence claims. *See Sawyer v. City of Los Angeles*, 2013 WL 12131168, at *5 (C.D. Cal., Aug. 13, 2013). But on these facts, negligence may be easier to establish, because it is based in part on conduct that is not part of the § 1983 claim, including the unintentional application of force against Lerma-Mayoral. *See Brower*, 489 U.S. at 596 (giving examples of torts involving the unintentional application of force, which do not amount to Fourth Amendment violations). *See also Rodriguez*, 819 F. Supp. 2d at 952 (holding that the lack of evidence of constitutional harm did not necessarily result in no liability under state tort law). And in any event negligence is not subject to the qualified immunity defense.

The Court finds there is some evidence to support a negligence or assault claim against Peraza, based on his participation in these events, and that a reasonable jury might find for Lerma-Mayoral on these claims.

**The City**

The City argues that in California, local governments are not subject to tort liability, and that their liability can arise only under statute. "California public

entities are not subject to common law tort liability; all liability must be pursuant to statute." *AE v. Cnty. of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012) (citing Cal. Gov't Code § 815 and *Guzman v. Cnty. of Monterey*, 46 Cal.4th 887, 897 (2009)); *Miklosy v. Regents of Univ. of Cal.*, 44 Cal.4th 876, 899 (2008). This is the only basis on which the City seeks summary judgment.

But under Cal. Gov't Code § 815(a), public entities are responsible for certain torts committed by their employees acting within the scope of their employment. The Ninth Circuit has held that this "clearly allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest." *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007) (citing *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 285 (1991)) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.").

Although the City raised other arguments in its reply brief, these are waived. Had they not been waived, however, the Court would likely have denied summary judgment, at least as to the negligence claim. Fisher was the only City officer involved in the operation, and his role was limited to planning. Still, there is enough evidence that a reasonable jury might find that he was negligent in the planning of the operation, and that the involvement of a third party such as a taxi driver was foreseeable.

**The County**

Because the County can be vicariously liable for the acts of its officers, it could be liable for negligence or assault, through Peraza or others.

A jury might find the acts of its officers in planning the operation and in attempting to apprehend Ayala in the taxi extreme and outrageous. A jury could also find reckless disregard of the probability of causing emotional distress to Lerma-Mayoral. And a jury could find the other elements of intentional infliction of emotional distress met as well.

**Bane Act**

The Bane Act, Cal. Civ. Code § 52.1, provides in pertinent part that a person who

> interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state

can be sued for damages. § 52.1(a) and (b).

Lerma-Mayoral's opposition makes clear this claim, at least as to Peraza, is based on violations of his right against unreasonable seizures. He has failed to present any evidence showing that Peraza violated this right, or for that matter engaged or attempted to engage in threats, intimidation, or coercion. *See Scalia v. County of* Kern, 308 F. Supp. 3d 1064, 1080 (E.D. Cal., 2018) (explaining that Bane Act violation requires coercion independent of the coercion inherent in the wrongful act itself). This claim is subject to summary judgment as to Peraza. And, as noted, Lerma-Mayoral withdrew his Bane Act claim as to the City.

As to the County, however, the acts of its officers other than Peraza can be taken into account, even though they are not named as Defendants. *See Perez v. City of Huntington* Park, 7 Cal. App. 4th 817, 820 (Cal. App. 2 Dist. 1992). When these are considered, the actions of the County officers might be found to have violated Lerma-Mayoral's Fourth Amendment right against unreasonable seizure, or other rights.[8] The Court has, however, found his Fourteenth Amendment rights

---

[8] The TAC refers to rights under both the U.S. and California Constitutions. (TAC, ¶ 42.) For example, his right against unreasonable seizures is protected not only by the Fourth Amendment, but by the California Constitution as well. *See* Cal. Const. Art. 1, §13. The County correctly points out, however, that Lerma-Mayoral had no right to privacy when he drove his taxi in public areas, and that there is no evidence any of his privacy rights were violated.

were not implicated. In the absence of a new decision by the Ninth Circuit or Supreme Court clarifying this point, this amounts to law of the case.

**Conclusion and Order**

The two motions for summary judgment (Docket nos. 65 and 66) are **GRANTED IN PART AND DENIED IN PART**. All claims against Rafael Peraza, except assault and negligence, are **DISMISSED WITH PREJUDICE**. To the extent the assault and negligence claims against Peraza are premised on his holding the taxi door closed or dragging Lerma-Mayoral from the taxi, they are **DISMISSED WITH PREJUDICE** as well. But in other respects, they survive.

All claims against the City of El Centro, except negligence and intentional infliction of emotional distress, are **DISMISSED WITH PREJUDICE**.

Claims against County of Imperial, to the extent they are based on violation of Lerma-Mayoral's Fourteenth Amendment rights or privacy rights, or on Peraza's violation of any of his U.S. constitutional rights, are **DISMISSED WITH PREJUDICE**.

The Fourth, Fifth, and Sixth claims, are **DISMISSED WITH PREJUDICE** as to all Defendants.

After these dismissals, no more federal claims remain. Ordinarily, when all claims over which the Court had original jurisdiction have been dismissed before trial, the Court should decline to exercise supplemental jurisdiction over the remaining state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27 (1966). "State courts are the proper fora for those claims, and the federal courts should stay out of the fray unless there is a reason for them to jump in—that is, unless 'values of judicial economy, convenience, fairness, and comity' would be served thereby." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1002 (9th Cir.), supplemented, 121 F.3d 714 (9th Cir. 1997), as amended (Oct. 1, 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

/ / /

Here, no such values counsel in favor of retaining jurisdiction. This action was removed from state court, where it was originally filed. This action is therefore **REMANDED** to the Superior Court of California for the County of Imperial.

All other pending motions are **DENIED AS MOOT** and all dates are **VACATED**.

**IT IS SO ORDERED**.

Dated: September 21, 2018

Hon. Larry Alan Burns
United States District Judge

15cv818-LAB (PCL)